**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO**

**Civil Action No. 1:25-cv-02976-RTG**

OLUWANISOLA ABOLAJI,
Plaintiff,

v.

NISOLA-ROUGH RIDERS FUTBOL ACADEMY, LLC,
ROUGH RIDERS HOLDING, LLC,
IMPACT SPORTS PERFORMANCE, LLC,
TONY A. SDAO,
MICHAEL PERRY,
RYLAN REED,
DEREK ROBINSON,
JOHN DOES 1-10,
Defendants.

---

**Amended COMPLAINT AND JURY DEMAND**

---

1. Plaintiff Oluwanisola "Sola" Abolaji (hereinafter "Plaintiff"), and through his pro se status, brings this action against Defendants Nisola-Rough Riders Futbol Academy, LLC ("NRFA"), Rough Riders Holding, LLC, Impact Sports Performance, LLC, Tony A. Sdao, Michael Perry, Rylan Reed, Derek Robinson, and John Does 1-10 (collectively, "Defendants") and alleges as follows:

## I. INTRODUCTION

2. Plaintiff Oluwanisola "Sola" Abolaji ("Plaintiff"), by and through his pro se representation, brings this civil action against Defendants Nisola-Rough Riders Futbol Academy, LLC ("NRFA"), Rough Riders Holding, LLC, Impact Sports Performance, LLC, Tony A. Sdao, Michael Perry, Rylan Reed, Derek Robinson, and John Does 1-10 (collectively, "Defendants").

3. This action arises from a coordinated scheme of fraud, concealment, breaches of fiduciary duty and contract, conversion, fraudulent transfers, civil theft, and violations of

statutory inspection rights that stripped Plaintiff a 49 percent member-owner and Director of Soccer of NRFA of salary, profits, and equity value.

4. In November 2019, Rough Riders Holding issued a Letter of Intent memorializing the parties' partnership to form NRFA and purchase Plaintiff's Nisola Futbol Academy intellectual property. The Letter of Intent specified that Plaintiff would receive 100 percent of net profit in Year 1 and 75 percent in Year 2, a $100,000 salary with a three-year employment term, and ownership split 49 percent (Plaintiff) and 51 percent (Rough Riders). (Ex. 1; see also Exs. M, M-1, 76, 114, 116.)

5. During negotiations, Plaintiff disclosed that a core objective of the venture was to acquire National Women's Soccer League ("NWSL") and United Soccer League ("USL") franchise rights and to execute a "youth-to-pro" pipeline. Defendants Tony A. Sdao, Michael Perry, Rylan Reed, Derek Robinson, and Luke Taylor affirmed that Rough Riders had professional-franchise experience and that Sdao had capital to fund these acquisitions. (Ex. 1; Exs. M, M-1, 76, 114, 116.)

6. Contemporaneous communications corroborate these promises and Defendants' direct engagement with professional-league leadership, including Plaintiff's December 18, 2020 texts arranging a meeting between Sdao and Jeff Plush (former NWSL Commissioner) and Adams Miller, and Sdao's October 29, 2020 email stating "the contact for HR is myself" and that "you and I are the principals." (Ex. 4; see also Exs. 2–3.)

7. After formation, Defendants misused pandemic-era PPP funds, manipulated financial statements and tax returns, and diverted NRFA revenues through Rough Riders and Impact affiliates while withholding books-and-records access required by statute and the Operating Agreement. (Exs. 22–41, 45, 47–49, 60, 63, 65–67, 71–75, 105–111, 120.)

8. NRFA bank records show large insider payments, circular "loan" transfers, and cash dissipation inconsistent with Defendants' claims of insolvency followed by a pretextual furlough and termination of Plaintiff on April 9, 2021. (Ex. O; Exs. 22–41, 45, 47–49.)

9. Defendants then engineered a sham "capital call" and circulated a pre-drafted separation agreement to freeze Plaintiff out and transfer value to Rough Riders-controlled entities, all while continuing to certify corporate "good standing" publicly and refusing statutory inspections from 2020 through 2025. (Exs. 61, 64, 71–75, 100, 113(1–6), 115, 117; see Ex. 66.)

10. Defendants' conduct also included retaliatory intimidation at the Sport Stable in March 2021, witnessed by staff, compounding the harm to Plaintiff's reputation and emotional well-being. (Exhibit 201 Greg Precisado Statement; Ex. 200 CW Statement; Ex. C Parents Letter.)

11. As a direct and foreseeable result of Defendants' misconduct, Plaintiff suffered unpaid salary and severance, withheld profits and equity value, and the destruction of a business expectancy to acquire the Colorado NWSL franchise valued at $3–5 million in 2020-2021 and over $100 million by 2024, resulting in an estimated $45 million loss of opportunity and appreciation. (Ex. A; Exs. 1, 2–4, 22–41, 60–67, 105–111, 116, 120.)

12. Plaintiff brings this action based on documents obtained in 2024–2025, including bank statements, payroll summaries, PPP records, tax returns, profit-and-loss statements, periodic reports, inspection demands and responses, witness statements, and valuation analyses detailed in the Exhibit Index.

## II. JURISDICTION AND VENUE

13. This Court has **subject-matter jurisdiction** under multiple independent bases.

14. **Federal-question jurisdiction** exists pursuant to **28 U.S.C. § 1331** because certain claims arise under federal civil-rights statutes, including 42 U.S.C. § 1981 (equal right to make and enforce contracts) and 28 U.S.C. § 1343 (actions to redress the deprivation of rights secured by federal law).

15. The Court also has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's related state-law claims—including fraud, breach of fiduciary duty, and other torts—because those claims form part of the same case or controversy as the federal causes of action.

16. Venue is proper in the District of Colorado under 28 U.S.C. § 1391(b) because all Defendants reside in this District, and a substantial portion of the events or omissions giving rise to the claims occurred here. Defendants regularly conducted business operations, paid vendors, and diverted NRFA funds within Colorado, including at the Sport Stable in Superior, Colorado.

17. Personal jurisdiction is proper under Colorado's long-arm statute, C.R.S. § 13-1-124(1)(a)–(b), because each Defendant (i) transacted business in Colorado and/or (ii) committed tortious acts in whole or in part within the State, satisfying both statutory and constitutional minimum-contacts requirements.

18. Choice of Law. The Colorado Limited Liability Company Act, C.R.S. § 7-80-101 et seq., governs the internal affairs and member rights of Colorado LLCs, and Colorado law therefore applies to the fiduciary-duty and ownership-rights issues pleaded herein.

19. Forum Convenience. Under 28 U.S.C. § 1404(a), this District is the most convenient and appropriate forum because all relevant witnesses, financial records, and business operations are located in Colorado.

## III. PARTIES

20. Plaintiff Oluwanisola Abolaji ("Plaintiff") is a natural person and resident of 524 Hawthorn Circle, Frederick, Colorado 80530. Plaintiff is a 49 percent member-owner of Nisola-Rough Riders Futbol Academy, LLC ("NRFA") and served as its Director of Soccer.

21. Defendant Nisola-Rough Riders Futbol Academy, LLC ("NRFA") is a Colorado limited-liability company with its principal office located at 1 Superior Drive, Superior, Colorado 80027. (Ex. M-1.)

22. Defendant Rough Riders Holding, LLC is a Colorado limited-liability company and the 51 percent controlling owner of NRFA. Its principal place of business is 1 Superior Drive, Superior, Colorado 80027.

23. Defendant Impact Sports Performance, LLC is a Colorado limited-liability company that controlled NRFA's financial accounts, payroll, and inter-company transfers. Its principal office is 1 Superior Drive, Superior, Colorado 80027.

24. Defendant Tony A. Sdao is an individual and principal of Rough Riders Holding, LLC and the controlling manager of NRFA. His business address is 501 Fairway Drive, Snowmass Village, Colorado 81615.

25. Defendant Michael Perry is the Chief Financial Officer for Rough Riders-related entities and was responsible for financial reporting, payroll administration, and tax filings for NRFA. His principal office is 1 Superior Drive, Superior, Colorado 80027.

26. Defendant Rylan Reed is a manager and officer who participated in NRFA and Impact Sports operations, including internal transfers and financial management. His business address is 1 Superior Drive, Superior, Colorado 80027.

27. Defendant Derek Robinson is a senior executive within the Rough Riders enterprise who participated in NRFA management decisions and oversight. His business address is 1 Superior Drive, Superior, Colorado 80027.

28. Defendants John Does 1 through 10 are unknown individuals and/or entities who participated in, facilitated, or benefited from the wrongful acts described herein. Their identities will be substituted as discovery reveals them.

## V. FACTUAL ALLEGATIONS

### A. Formation, Ownership, and Agreements

29. On November 15, 2019, Plaintiff executed a Letter of Intent with Rough Riders Holding, LLC, in which the parties agreed that Plaintiff would receive 100 percent of the net profit in Year 1 and 75 percent in Year 2. (Ex. 1, *Letter of Intent – Nisola-Rough Riders Futbol Academy LLC*.)

30. During negotiations through June–November 2019, Plaintiff specifically disclosed that a core objective of Nisola Futbol Academy's business plan was to acquire professional NWSL and USL franchise rights and to build a "youth-to-pro" pathway to support those clubs. These discussions occurred with Tony A. Sdao, Michael Perry, Rylan Reed, Derek Robinson, and Luke Taylor (then Rough Riders/Sport Stable manager).

31. In those meetings, Defendants represented that (a) Rough Riders had existing experience acquiring and operating professional sports franchises, citing the Cedar Rapids Rough Riders hockey club as a feeder for their youth programs; (b) Sdao personally had

sufficient capital to fund acquisition of professional soccer franchises; and (c) the purchase of Nisola Futbol Academy's intellectual property included its strategic plan to acquire NWSL/USL rights and execute Plaintiff's youth-to-pro model as part of the venture. Plaintiff reasonably relied on these specific written and oral promises in executing the Letter of Intent and subsequent Operating and Employment Agreements. (Ex. 1; Exs. M, M-1, 76, 114, 116.)

32. The Letter of Intent memorialized material terms consistent with these representations—capitalization, intellectual-property buyout, salary, and profit allocations (100 percent in Year 1; 75 percent in Year 2)—which Defendants confirmed would fund and advance the franchise-acquisition plan as part of NRFA's core mission. (Ex. 1 at 1–3.)

33. Defendants Sdao, Perry, Reed, and Robinson, together with Luke Taylor, repeatedly affirmed between November 2019 and March 2021 that Rough Riders would leverage its professional-club experience and Sdao's capital to execute Plaintiff's NWSL/USL plan. These assurances were knowingly false or made without present intent to perform, as shown by their subsequent diversion of funds, contrived "capital call," and termination of Plaintiff while siphoning NRFA revenues to affiliates. (Exs. 22–41, 63, 65–67, 108–111, 116, 120.)

34. Contemporaneous communications further confirm that the professional-league discussions were genuine and ongoing. On December 18, 2020, Plaintiff texted Sdao to arrange a meeting with Jeff Plush, former Commissioner of the NWSL, and Adams Miller, to discuss women's soccer opportunities. Sdao thanked Plaintiff for "a good meeting today" and for being "a rare person," confirming his active engagement.

35. In an October 29, 2020 email chain, Sdao wrote that "the contact for HR is myself" and that "you and I are the principals of the Rough Rider Soccer Club," demonstrating his managerial control over Rough Riders and Impact Sports. (Ex. JH, *Email/Text Correspondence Between Plaintiff and Tony Sdao – Oct 2020 & Dec 2020*.)

36. In November and December 2019, Plaintiff operated camps, trainings, and combines at the Sport Stable through Nisola Futbol Academy, then 100 percent owned by Plaintiff. On December 6, 2019, Plaintiff and Sdao executed an Operating and Contribution Agreement forming NRFA (49 percent Plaintiff / 51 percent Rough Riders). (Exs. M, M-1, 76, 114.)

37. Effective January 1, 2020, Plaintiff entered an Employment Agreement with NRFA providing a $100,000 salary, three-year term, severance, and profit participation. (Ex. N.)

38. Plaintiff contributed capital, goodwill, brand assets, and soccer-development know-how to launch NRFA's youth-to-pro program. (Ex. 116.)

**B. Operations and Early Representations**

39. By late 2019 and early 2020, NRFA was operating from the Sport Stable, collecting player fees and camp revenues. (Exs. 22–41, 45, 47–49.)

40. Throughout 2020 and 2021, Defendants represented that NRFA's finances were sound and that PPP obligations had been satisfied, while withholding full access to books and records. (Exs. 60, 67, 105–111, 120.)

## C. PPP, Salary Cuts, and Furlough

41. Defendants obtained Paycheck Protection Program ("PPP") funding through related entities—including Impact Sports and Sport Stable—totaling approximately $280,000, purportedly to preserve payroll. (Ex. 65.)
42. Despite receiving federal relief funds, Defendants reduced Plaintiff's salary by 25 percent in 2020. (Ex. 63.)
43. On April 9, 2021, Defendants furloughed Plaintiff, citing "insolvency," even though NRFA had sufficient cash reserves and ongoing revenues. (Ex. O.)

## D. Banking Trail Showing Diversion (2020–2022)

44. NRFA bank records reflect insider checks and withdrawals inconsistent with insolvency and contemporaneous claims of cash shortage. (Exs. 22–41, 45, 47–49.)
45. Transactions include, among others: two $50,000 checks in January 2020 (Ex. 22); an August 2020 check for $22,786.66 with additional withdrawals (Ex. 29); October–November 2020 checks for $20,487.05, $10,750, $10,234.00, and $10,234.15 (Exs. 31–32); and January–June 2021 checks for $8,000, $6,000, $5,844.37, and $7,400, along with circular "loan" transfers. (Exs. 33, 36, 38–39.)
46. By July 2021, the account balance collapsed to $264.84, and by December 2021 through April 2022, the account was held at approximately $25.00, consistent with dissipation following insider transfers. (Exs. 41, 45, 47–49.)

## E. False/Misleading Financials and Tax Filings

47. Despite material deposits reflected in bank statements and internal P&Ls, tax returns for 2020–2023 reported cumulative losses exceeding $441,000. (Exs. 105–110, 60, 67, 109, 120.)
48. A February 28, 2021 internal "estimate" shows negative retained earnings while bank inflows exceeded $188,000; an April 10, 2021 internal P&L contradicts the claimed insolvency later used to justify Plaintiff's furlough. (Exs. 108, 61.) (Ex. E – Feb. 28 2021 'Estimated' NRFA Financials show positive income and cash inflows contradicting claims of insolvency used to justify Plaintiff's termination.)
49. Periodic reports filed with the Colorado Secretary of State from 2021–2025 certified good standing while concealing material ownership and financial facts. (Exs. 71–75.)

## F. Individual Roles

50. **Michael Perry.** Perry authored the April 9, 2021 furlough letter asserting "no funds available," even as contemporaneous bank records showed available funds. He then advanced a fabricated "capital call," impairing Plaintiff's voting and ownership rights. (Ex. O; Exs. 22–41.)

51. **Tony A. Sdao.** At a March 11, 2021 membership meeting, Sdao directed a dissolution/"loan-then-repayment" strategy despite available cash; when Plaintiff declined to fund a capital call he had no duty to meet, Sdao threatened shutdown and circulated a pre-drafted separation agreement prepared by outside counsel—constituting intentional misrepresentation, breach of fiduciary duty, and fraudulent inducement aimed at stripping Plaintiff's 49% equity. (See Ex. O; Ex. 66.)

52. **Rylan Reed.** Reed operated NRFA finances through Impact Sports, withheld transaction data, coordinated internal transfers labeled "loans" (Exs. 33, 36, 38–39), mischaracterized PPP usage, and pressed a baseless claim that NRFA owed Impact Sports more than $100,000 without supporting invoices—conduct constituting fraud and breach of fiduciary duty. (Ex. 211 – Nov. 16 2020 text from Tony Sdao confirming Rylan Reed was assigned to assist and support Plaintiff in operations.)

   a. **Supplemental Allegation – Tony Sdao Sport Stable Incident (March 2021)**

53. Multiple witnesses, including RoughRiders Recreational Director Greg Preciado and Soccer Secretary Courtney Wilcox, corroborate that in March 2021 Sdao confronted Plaintiff inside the RoughRiders Sport Stable in a hostile and intimidating manner to force attendance at a "membership meeting" regarding Plaintiff's removal. (Exhibit 201 Greg Precisado Statement; Ex. 200 CW Statement; Ex. C Parents Letter.)

54. While Plaintiff was conducting a youth training session, Sdao entered the turf area, interrupted practice in front of children, aggressively demanded Plaintiff attend the meeting, continued advancing, and shouted while waving documents; witnesses observed Sdao physically corner Plaintiff against a wall, blocking his exit and continuing to berate him. (Exhibit 201 Greg Precisado Statement; Ex. 200 CW Statement; Ex. C Parents Letter.).

55. Video evidence confirms the incident occurred as described. (Ex. 210 1-2/2-2 – March 1 2021 video recording showing Tony Sdao cornering Plaintiff during practice, referenced in Courtney Wilcox and Greg Preciado statements.)

56. Preciado described Sdao's demeanor as "nasty and threatening," stating the owner "backed Sola into a corner in front of children," while staff and players looked on; Wilcox attested Sdao was "yelling at Sola in a way that scared everyone on the field." (Exhibit 201 Greg Precisado Statement; Ex. 200 CW Statement; Ex. C Parents Letter.)

57. The incident occurred weeks after racially charged attacks and threats at Williams Field and within the Sport Stable complex, including "GORILLA" graffiti and a gun-brandishing incident described in parents' March 12, 2021 letter demanding action

from Sdao, Perry, and Robinson. (Exhibit 109 – Parent letter to RoughRiders_SportStable leadership)

58. Despite multiple written and verbal reports by Plaintiff and witnesses, no investigation or discipline was undertaken. Instead, within weeks, Sdao and his executive team (Perry, Reed, and Robinson) proceeded with a false "capital call" and termination, effectively freezing Plaintiff out of the company he helped build. (Ex. O.)

59. The combination of physical intimidation, public humiliation, and retaliatory termination inflicted severe emotional harm (including panic attacks and insomnia) and reputational and financial damage, as word of Plaintiff's ouster spread through the Colorado soccer community. (Exhibit 201 Greg Precisado Statement; Ex. 200 CW Statement; Ex. C Parents Letter, Ex. 203 usb March 11 Zoom video.)

## G. Refusal to Permit Statutory Inspection

60. From 2020–2025, Plaintiff issued multiple written inspection demands under C.R.S. § 7-80-408 and the Operating Agreement. (Exs. 100, 113(1–6), 115, 117.)

61. Defendants refused or delayed, offering incomplete spreadsheets while withholding bank, payroll, and tax source records until 2024–2025; in a July 14, 2025 response, Defendants claimed records had already been produced and admitted NRFA remained open solely to "defend your lawsuit." (Exs. 105–111, 64, 117; Ex. 66.)

## H. Damages and Loss

62. Plaintiff suffered extensive economic and non-economic damages directly and foreseeably caused by Defendants' fraud, fiduciary breaches, and wrongful termination, including lost salary and benefits, deprivation of equity value, withheld distributions, and destruction of a unique business opportunity to acquire and develop a Colorado NWSL franchise.

63. **Unpaid Salary and Severance.** Plaintiff is owed more than $250,000 in unpaid wages, commissions, and severance under the January 1, 2020 Employment Agreement. (Ex. N.)

64. **Withheld Profit Distributions.** Under the LOI and Operating Agreement, Plaintiff was entitled to 100% of net profit in Year 1 and 75% in Year 2; Defendants failed to distribute Plaintiff's profit share despite positive early performance and cash inflows. (Exs. 22–41, 45, 47–49.)

65. **Loss of Equity Value.** Insider transfers, falsified accounting, and diversion of assets through affiliated entities dissipated NRFA's assets and destroyed the fair-market value of Plaintiff's 49% ownership interest, including goodwill and brand equity, estimated to exceed $5 million.

66. **Loss of Business Expectancy (NWSL/USL).** The partnership centered on acquiring professional franchise rights and building a youth-to-pro pipeline. Plaintiff contributed IP, contacts, and brand; results included growth of youth/adult programs, a semi-pro indoor

team, and direct engagement with NWSL executives and owners (Jeff Plush, Adams Miller, Gotham FC, Chicago Red Stars, Kansas City Current, Racing Louisville, Washington Spirit). Defendants' fraudulent bookkeeping, manufactured capital calls, and pretextual termination eliminated NRFA's eligibility to bid for the Colorado NWSL franchise during the 2020–2021 window when valuations were approximately $3–5 million; by 2024, the Colorado rights sold for over $100 million, supporting a conservative $45 million lost-opportunity valuation. (Ex. JH; Exs. 2–4.)

67. **Reputational and Emotional Harm.** Defendants' coordinated defamation, public humiliation, and retaliatory termination—including the Sport Stable incident—caused severe emotional distress and professional stigma, with ongoing harm to future opportunities. (Exhibit 201 Greg Precisado Statement; Ex. 200 CW Statement; Ex. C Parents Letter.)

68. **Causation and Foreseeability.** Defendants knew Plaintiff's participation and IP were predicated on pursuing professional-league acquisitions; their misrepresentations induced reliance and directly caused loss of the opportunity and resulting appreciation.

69. **Quantification.** Comparable franchise transactions and the public sale of Colorado NWSL rights at over $100 million establish a market-based loss exceeding $45 million, in addition to unpaid wages and equity-value destruction.

70. Plaintiff seeks, inter alia, $45,000,000 for the lost business opportunity and equity appreciation associated with the foregone franchise acquisition.

71. Plaintiff also seeks $250,000+ in unpaid wages, commissions, and profit-share owed under the employment and ownership agreements.

72. The franchise-acquisition promises were central inducements for Plaintiff to sell his IP and accept a 49% membership stake in NRFA. Given RoughRiders' ownership of the Cedar Rapids RoughRiders and repeated statements regarding capital and execution capability, Plaintiff's reliance was reasonable. Defendants' subsequent fabrication of insolvency, insider transfers, and pretextual termination proximately caused the lost opportunity during the 2020–2021 pricing window (~$3–$5 million), now exceeding $100 million in value. (Ex. 1; Exs. 22–41, 60–67, 105–111, 120.)

73. Additional categories and amounts will be supported by expert testimony, financial analysis, and market-valuation evidence at the appropriate stage.

## I. Discovery Rule and Tolling

74. Defendants' concealment prevented discovery of the scheme until records emerged in 2024–2025. Under Colorado's discovery rule and equitable tolling, all claims are timely. (Exs. 105–111, 117, 66.)

75. Plaintiff did not obtain NRFA's 2020–2023 tax returns or complete bank statements until September 2024, despite written requests beginning in March 2022; pursuant to C.R.S. § 13-80-108(1), the statute of limitations did not begin to run until those records were produced. (Ex. 117.)

**J. Tony A. Sdao's Central Role in the Fraudulent Scheme**

76. At the March 11, 2021 membership meeting, Sdao—acting as majority owner—directed a dissolution strategy predicated on Rough Riders "loaning funds" to NRFA and then demanding repayment, despite available cash reserves reflected in bank statements; when Plaintiff declined a capital call he had no duty to fund, Sdao threatened shutdown and circulated a pre-drafted separation agreement from outside counsel, misrepresenting solvency to force Plaintiff's removal. (Exs. 22–41; Ex. O.)

77. Subsequent correspondence, including the April 9, 2021 furlough letter and the July 14, 2025 letter admitting NRFA remains open only to "defend your lawsuit," demonstrates Sdao's personal intent and ongoing concealment. (Ex. O; Ex. 66.)

**K. Rylan Reed – Operational Concealment and Retaliation**

78. Reed handled NRFA's operational finances through Impact Sports, withheld transaction data, coordinated internal transfers labeled "loans" (Exs. 33, 36, 38–39), misled Plaintiff about PPP usage by redirecting funds to Impact expenses, and advanced a >$100,000 "owed to Impact" assertion without invoicing—constituting fraud and breach of fiduciary duty. (Ex. 211 – Text message from Tony Sdao directing Rylan Reed to assist Plaintiff with operations; Ex. 216 – Impact Sports Performance profile confirming Rylan Reed as Owner/General Manager.)

79. Danielle Reed, Rylan Reed's wife and Impact Kids Club owner, texted Plaintiff on March 5 2021 acknowledging the events that had transpired and expressing regret for the hostile environment. (Ex. 212.) Her statement confirms knowledge of the conflict and Rylan Reed's continuing role within Impact Sports Performance during the period of financial misconduct.

**L. Refusal to Permit Statutory Inspection**

80. From 2020 through 2025, Plaintiff issued multiple written demands for access to NRFA's books and records pursuant to C.R.S. § 7-80-408 and under the NRFA Operating Agreement. (Exs. 100, 113(1-6), 115, 117.)

81. Defendants refused or delayed production, providing incomplete spreadsheets while withholding source financial documents including bank, payroll, and tax records until 2024–2025. (Exs. 105-111, 64, 117.)

82. In a July 14, 2025 response, Defendants asserted that all records had been produced and admitted that NRFA was maintained solely to "defend your lawsuit," demonstrating continuing concealment and bad faith. (Ex. 66.)

**M. Damages and Loss**

    a.  1. Overview

83. Plaintiff Oluwanisola "Sola" Abolaji suffered extensive economic and non-economic damages directly and foreseeably caused by Defendants' fraudulent conduct, breaches of fiduciary duty, wrongful termination, and concealment of financial records.

84. These damages include: (a) loss of salary and benefits, (b) deprivation of equity value, (c) withheld profit distributions, and (d) destruction of a unique business opportunity to acquire and develop a Colorado National Women's Soccer League ("NWSL") franchise central to the parties' partnership plan.

85. Defendants' fraudulent scheme stripped Plaintiff of the entire value of NRFA, including his 49 percent ownership interest, intellectual property, and professional standing within the soccer industry.

## N. Specific Categories of Damages

86. **Unpaid Salary and Severance.** Plaintiff is owed more than $250,000 in unpaid wages, commissions, and severance under the January 1, 2020 Employment Agreement. Defendants' fabricated "insolvency" and termination deprived him of earned compensation and contractual severance benefits. (Ex. N.)

87. **Withheld Profit Distributions.** Under the Letter of Intent and Operating Agreement, Plaintiff was entitled to 100 percent of NRFA's net profit in Year 1 and 75 percent in Year 2. Defendants failed to distribute Plaintiff's 49 percent profit share despite positive early performance and cash inflows. (Exs. 22-41, 45, 47-49.)

88. **Loss of Equity Value.** Defendants' insider transfers, falsified accounting, and diversion of assets through RoughRiders and Impact affiliates dissipated NRFA's assets and destroyed the fair-market value of Plaintiff's 49 percent ownership interest, including goodwill and brand equity, estimated to exceed $5 million.

89. **Loss of Business Expectancy in Professional-Franchise Development.** From inception, the partnership was built around acquiring NWSL and USL franchises and establishing a youth-to-pro pathway. Defendants personally assured Plaintiff that RoughRiders' ownership of the Cedar Rapids RoughRiders (a professional hockey club) and Tony Sdao's capital would fund that plan.

90. In reliance, Plaintiff contributed Nisola Futbol Academy's intellectual property, professional contacts, and brand identity, which Defendants integrated into NRFA operations. Plaintiff's leadership produced measurable results:

91. Development of youth and adult competitive programs;

92. Launch of a semi-professional indoor team; and

93. Direct engagement with NWSL executives and owners including Jeff Plush (former Commissioner), Adams Miller, and representatives of Gotham FC, Chicago Red Stars, Kansas City Current, Racing Louisville, and Washington Spirit. (Ex. JH; Exs. 2-4.)
   a.

94. Despite these successes, Defendants sabotaged the venture through fraudulent bookkeeping, manufactured "capital calls," and pretextual termination, eliminating

NRFA's eligibility to bid for the Colorado NWSL franchise during the 2020–2021 window, when franchise valuations ranged from $3 million to $5 million. By 2024, the Denver Summit group purchased those same rights for over $100 million—demonstrating more than a twenty-fold increase in value. Defendants' misconduct directly caused Plaintiff to lose this opportunity, conservatively valued at $45 million.

95. **Reputational and Emotional Harms.** Defendants' coordinated defamation, public humiliation, and retaliatory termination—including the Sport Stable incident witnessed by staff and players—caused Plaintiff severe emotional distress, professional stigma, and long-term harm within the Colorado soccer community. (Ex. L; Ex. GP Statement; Ex. CW Statement; Ex. Parents Letter.)

## O. Damages Causation and Specificity

96. **Foreseeability.** Defendants knew that Plaintiff's participation and intellectual property were predicated on pursuing professional-league acquisition opportunities. Their misrepresentations induced reliance and foreseeably caused loss of that opportunity.

97. **Causation.** Defendants' falsified records, fabricated insolvency, and wrongful termination severed Plaintiff from the enterprise immediately before the NWSL expansion process, preventing his execution of the agreed-upon acquisition plan.

98. **Quantification.** Comparable franchise transactions and the Colorado NWSL sale exceeding $100 million establish a market-based loss exceeding $45 million, separate from unpaid wages and equity value.

    a.   **4. Summary of Claimed Damages**

| b. Category | c. Description | d. Estimated Amount |
|---|---|---|
| e. Unpaid Salary & Severance | f. Wages, commissions, and severance owed under Employment Agreement (Ex. N). | g. $250,000 + |
| h. Withheld Profit Distri | i. Plaintiff's 49 % share of NRFA profits (2020–2022). | j. $150,000 |

| | | | | | |
|---|---|---|---|---|---|
| | butions | | | | |
| k. | Loss of Equity Value | l. | Dissipation and diversion of assets destroying Plaintiff's 49 % ownership interest. | m. | $ 5,000,000 |
| n. | Lost Business Expectancy | o. | Foregone NWSL/USL franchise opportunity now valued > $ 100 M ($\approx$ $ 45 M loss). | p. | $ 45,000,000 |
| q. | Reputational & Emotional Harm | r. | Professional and personal injury from retaliation and public humiliation. | s. | TBD (expert testimony) |

**99. Total and Supporting Evidence**

100.    Plaintiff's total claimed damages include, but are not limited to:

a.   (a) $ 45 million in lost business opportunity and equity appreciation representing the conservative current-market valuation of the foregone franchise acquisition; and

(b) $ 250,000 + in unpaid wages, commissions, and profit-share owed under the employment and ownership agreements.

101.    These damages are pled in good faith and will be substantiated through expert valuation testimony, financial-record analysis, and market comparables consistent with professional-sports franchise transactions.

102.    Supporting documentation includes Exhibits 1, 2-4, 22-41, 60-67, 105-111, 116, 120, and the valuation summary (Ex. A).

**P. Discovery Rule and Tolling**

103. Defendants' concealment prevented discovery of the scheme until records emerged in 2024–2025. Under Colorado's discovery rule and equitable tolling, all claims are timely. (Exs. 105-111, 117, 66.)

104. Plaintiff did not obtain NRFA's 2020–2023 tax returns or complete bank statements until September 2024, despite repeated written requests beginning in March 2022 (Ex. 117). Pursuant to C.R.S. § 13-80-108(1), the limitations period did not begin to run until September 2024.

**Q. Explanation of Newly Discovered Evidence and Claim Distinction**

105. This action is not duplicative of *Abolaji v. Impact Sports Performance, LLC*, Civil Action No. 1:23-cv-02453-GPG-TPO (the "Prior Action"), because it arises from newly discovered facts and evidence unavailable during that case and involves a different factual nucleus and legal theory.

106. In September 2024, after filing the Third Amended Complaint in the Prior Action, Plaintiff received internal financial records and correspondence from Defendants Tony A. Sdao, Michael Perry, and Rylan Reed, including bank statements, profit-and-loss summaries, and PPP-loan documentation (collectively, the "September 2024 Disclosures"). These materials revealed that Defendants knowingly falsified financial reports, concealed profits, and misrepresented ownership interests in the Nisola-RoughRiders Futbol Academy and affiliated entities.

107. As a result, this complaint alleges post-employment fraudulent conduct and breaches of fiduciary duty that occurred after Plaintiff's termination and after the operative pleadings in the Prior Action. The current claims concern Defendants' misappropriation of corporate funds, false financial statements, concealment of assets, and self-dealingin violation of duties owed to Plaintiff as an equity owner—conduct that could not have been alleged earlier.

108. The Prior Action, by contrast, addressed:
    a. Nonpayment of wages and discrimination under an employment agreement;
    b. An earlier PPP-loan application; and
    c. Conversion and civil-theft claims tied to pre-2021 transactions.

109. The present case arises from distinct, later-occurring events, including:
    a. (a) full ledgers of NRFA bank accounts showing systematic diversion of funds after the Prior Action was filed (Exs. 22–49);
    (b) Defendants' continued refusal to produce books-and-records despite statutory inspection demands (Exs. 100–117); and
    (c) new fraudulent-transfer activity under C.R.S. § 38-8-101 discovered in late 2024 (Exs. 121–123).

110. Under *Katz v. Gerardi*, 655 F.3d 1212, 1217 (10th Cir. 2011), the rule against claim-splitting bars only actions arising from the same operative facts; a new action may proceed when "the operative facts materially differ." Likewise, *McWilliams v. Colorado*,

121 F.3d 573, 574 (10th Cir. 1997), authorizes dismissal of only virtually identical claims.

111.   Here, the operative facts materially differ. The Prior Action involved employment-related conduct through early 2021, whereas this action addresses post-2021 siphoning of funds, concealment of financial data, and fraudulent transfersuncovered in September 2024. These facts were not known and could not reasonably have been discovered earlier.

112.   Accordingly, this lawsuit does not violate the rule against claim-splitting or 28 U.S.C. § 1915(e)(2). It seeks relief for separate wrongs and injuries requiring independent adjudication based on a distinct factual record.

## IV. CLAIMS FOR RELIEF *(Each count incorporates ¶¶ 1–112.)*

## COUNT I — FRAUD / FRAUDULENT MISREPRESENTATION & CONCEALMENT
*(Against All Defendants)*

113.   Plaintiff incorporates ¶¶ 1–112 as if fully set forth herein.

114.   **Who:** Defendants Tony A. Sdao (controlling owner and manager), Michael Perry (CFO and controller), Rylan Reed (operations and payroll manager), and Derek Robinson (president), together with entity Defendants Nisola-Rough Riders Futbol Academy LLC ("NRFA"), Rough Riders Holding LLC, and Impact Sports Performance LLC (collectively, the "Enterprise").

115.   **What:** Defendants represented that NRFA was insolvent or unprofitable; that PPP funds were properly applied to preserve payroll; that internal financials were accurate; and that Plaintiff had received all records to which he was entitled. They concealed bank withdrawals and affiliate transfers, inflated Sport Stable and Impact Sports invoices, PPP usage conflicts, and true financial statements.

116.   **When & Where (illustrative instances):**
(a) Feb. 24–Mar. 11 2021 — Defendants circulated "estimate" financials and pressed a capital call asserting insolvency (Exs. F, Z).
(b) Apr. 9 2021 — Furlough letter citing financial distress and directing Plaintiff to unemployment (Ex. O).
(c) 2020–2023 — Year-end P&Ls and tax returns show cumulative losses inconsistent with bank deposits and invoices (Exs. 60, 67, 108-111, 105-107, 110).
(d) 2020–2022 — MidFirst Bank records reflect structured insider checks, withdrawals, and balances abandoned at $25 (Exs. 22-41, 45, 47-49).
(e) 2020–2025 — Emails and letters responding to Plaintiff's inspection demands asserting "all records have been provided" (Exs. 100, 113(1-6), 115, 117, 66).
(f) 2020–2021 — Payroll cuts implemented while PPP-backed payroll funds remained available (Exs. 63-65, B).

117.    **How False or Misleading:**

(a) "Insolvency" was manufactured through insider payments to Rough Riders and Impact Sports and off-book transfers while reporting losses contradicted by bank deposits and internal P&Ls (Exs. 22-41, 45, 47-49, 60, 67, 121, 61, F, X).

(b) PPP certifications were false because Plaintiff's salary was cut 25 percent and he was later furloughed while funds existed to maintain payroll (Exs. B, 63-65, O).

(c) Defendants' statements that "all records have been produced" were false; key financial documents and returns were withheld until 2024-2025 (Exs. 105-111, 117, 66).

(d) The March 2021 "estimate" financials used to justify the capital call were later admitted by Defendants to be "not accurate financials." (Exs. F, X.)

## A. Scienter and Scheme

118.    Defendants knew their statements were false or acted with reckless disregard for the truth. Sdao and Perry controlled the books and certified returns; Reed handled operations and PPP funding; Robinson approved strategic actions as president. Their coordinated actions—bank withdrawals, affiliate billing, and record suppression—demonstrate a concerted scheme to depress profits, justify Plaintiff's ouster, and divert assets to Rough Riders and Impact Sports. (Exs. 22-41, 45, 47-49, 108-111, 121, 61, F, X, 117, 66.)

119.    The pattern satisfies the elements of common-law fraud and violates C.R.S. § 18-5-102 (false representation to obtain a thing of value) and § 6-1-105(1)(e) (Colorado Consumer Protection Act – knowing false representation of financial condition).

## B. Reliance

120.    Plaintiff reasonably relied on Defendants' representations by:

(a) continuing to perform under his Employment Agreement;

(b) forgoing immediate legal action while awaiting "complete" financial records; and

(c) not seeking emergency injunctive relief prior to his April 9 2021 termination, to his detriment. (Exs. O, 100, 113, 115, 117.)

## C. Causation and Damages

121.    Defendants' fraud directly and proximately caused substantial harm to Plaintiff, including but not limited to:

a.    (a) **Compensation:** Unpaid wages and severance promised by contract and backed by available PPP funds. (Exs. N, 63-65, B, O.)

(b) **Ownership and Equity:** Destruction of Plaintiff's 49 percent membership value through diversion of assets and fabricated losses. (Exs. M, M-1, 22-41, 45, 47-49, 60, 67, 108-111.)

(c) **Lost Business Expectancy:** Loss of the NWSL/USL franchise acquisition opportunity and associated investor relationships valued in the tens of millions. (Exs. A, 131, W, AC, I, NFARIDERS Plan.)

(d) **Consequential and Reputational Harm:** Litigation costs, loss of goodwill, emotional distress, and therapy expenses. (Exs. 111, 116.)

122.    Based on financial records and valuation materials, Plaintiff's compensatory damages exceed $15 million, including lost profits, equity value, franchise expectancy, and consequential losses, subject to proof at trial. (Exs. A, 60, 67, 108-111, 22-41, 45, 47-49.)

## D. Tolling and Discovery Rule

123.    Defendants concealed bank activity, true P&Ls, PPP usage, and tax returns, repeatedly asserting that all responsive materials had been produced. Many key documents were first obtained in 2024-2025. Fraud claims are timely under C.R.S. § 13-80-108(3) and equitable tolling. (Exs. 105-111, 117, 66.)

## E. Aggravating Circumstances / Punitive Damages

124.    Defendants' conduct was willful, wanton, and malicious—a calculated scheme to strip Plaintiff of compensation and equity and to frustrate enforcement of his rights. Under C.R.S. § 13-21-102, Plaintiff is entitled to exemplary (punitive) damages in an amount to be determined at trial.

## F. Requested Relief on Count I

125.    On Count I, Plaintiff seeks judgment jointly and severally against all Defendants awarding:

   a.  (a) Compensatory damages in an amount to be determined at trial but not less than $15 million;
   (b) Exemplary (punitive) damages;
   (c) Disgorgement of ill-gotten gains and a constructive trust over funds transferred to Rough Riders Holding, Impact Sports, and related accounts;
   (d) A full accounting and claw-back of fraudulent transfers;
   (e) Pre- and post-judgment interest, costs, and reasonable attorney fees as allowed by law; and
   (f) All further relief the Court deems just and proper.

**Key Exhibits for Count I** Ex. 60; 61; F; X; 105-111; 22-41; 45; 47-49; 63-65; B; 117; 66; 121; M; M-1; N; O; A; 131; W; AC; I.

**COUNT II — FRAUDULENT TRANSFER (C.R.S. § 38-8-101 et seq.)**

*(Against All Defendants)*

126.    Plaintiff incorporates ¶¶ 1–125 as if fully set forth herein.

**A. Statutory Elements**

127.    Under the Colorado Uniform Fraudulent Transfer Act ("CUFTA"), a transfer made with actual intent to hinder, delay, or defraud a creditor—or made without receiving reasonably equivalent value while the debtor was insolvent—is fraudulent.

128.    Plaintiff qualifies as both an equity owner (49 percent member of NRFA) and a creditor (owed wages, severance, and profit distributions). See C.R.S. § 38-8-102(4), (6).

**B. Fraudulent Transfers Identified**

129.    **Bank Withdrawals (2020–2021).** NRFA issued insider checks that drained company funds immediately after deposits, including:

130.    Oct. 2020: Check #1058 for $20,487.05 and Check #1057 for $10,750 (Ex. 31);

131.    Nov. 2020: Checks for $10,234.00 and $10,234.15 (Ex. 32);

132.    Jan. 2021: Check #1095 for $8,000 (Ex. 33);

133.    Mar. 2021: Check #1109 for $6,000 (Ex. 36);

134.    May 2021: Check #1131 for $5,844.37 (Ex. 38);

135.    Jun. 2021: Check #1134 for $7,400 paired with a $7,700 "loan transfer" (Ex. 39).

136.    **Affiliate Invoices and Payments (2020–2021).** NRFA funds were diverted to Sport Stable and Impact Sports entities controlled by Defendants, exceeding $20,000 per month. (Ex. 121.)

137.    **Equity Transfers (2023 Balance Sheet).** Rough Riders Holdings was credited with $325,759.60 in equity while NRFA's retained earnings were reported at –$270,758.60 and its bank balance was $25. (Ex. 111.)

138.    **Account Abandonment.** By August 2021, NRFA's MidFirst account was reduced to $264.84; by December 2021 through April 2022, the balance remained $25.00. (Exs. 41, 45, 47–49.)

**C. Intent and Badges of Fraud**

139.    The transfers bear multiple badges of fraud recognized under C.R.S. § 38-8-105(2):
(a) Transfers to insiders (Sdao, Perry, Reed, Impact Sports, and Sport Stable);
(b) Lack of reasonably equivalent value — no legitimate services rendered and inflated affiliate invoices;
(c) Concealment of transactions and records from Plaintiff despite statutory inspection rights;

(d) Transfers executed while Plaintiff was asserting wage and ownership claims; and

(e) NRFA was rendered insolvent while Defendants maintained related entities solvent and profitable.

140. Defendants knew or should have known that these transfers would deplete NRFA assets and impair Plaintiff's ability to recover his equity and contractual entitlements. The pattern of "loan repayments" and affiliate payments reflects actual intent to hinder, delay, and defraud within the meaning of C.R.S. § 38-8-105(1)(a).

## D. Damages

141. As a result of the fraudulent transfers, Plaintiff has been deprived of:

(a) the value of his 49 percent equity interest;

(b) wages, severance, and distributions owed under his agreements; and

(c) the ability to realize the benefit of his investment and professional business expectancy.

142. The aggregate amount of fraudulent transfers and related diversions totals hundreds of thousands of dollars in cash and equity value. Together with lost profits, equity, and consequential harms, Plaintiff's recoverable damages on this count are not less than $15,000,000.

## E. Relief Sought on Count II

143. Plaintiff requests that the Court enter judgment in his favor and against all Defendants jointly and severally, granting the following relief:

a. (a) Avoidance and claw-back of fraudulent transfers under C.R.S. § 38-8-108;

(b) Attachment of assets transferred to affiliates and insiders;

(c) Imposition of a constructive trust over diverted funds and equity;

(d) Compensatory and punitive damages in an amount not less than $15 million;

(e) Pre- and post-judgment interest, costs, and reasonable attorney fees where authorized; and

(f) All further equitable relief the Court deems just and proper.

**F. Key Exhibits for Count II** Exs. 22–41; 45; 47–49; 121; 111; 31; 32; 33; 36; 38; 39

## COUNT III — BREACH OF CONTRACT

144. (Against NRFA, RoughRiders Holdings, and Tony Sdao)

145. Plaintiff incorporates ¶¶1–123 as if fully set forth herein.

## A. Governing Contracts

146. **Operating Agreement & Contribution Agreement (Dec. 2019):** Plaintiff was granted a 49% ownership interest in NRFA, with rights to profit distributions, inspection of records, and participation in management. (Exs. M, M-1, 114, 76).

147. **Employment Agreement (Dec. 6, 2019):** Plaintiff was employed as Director of Soccer for a guaranteed three-year term, at $100,000 annual salary, plus benefits, severance protections, and profit participation. (Ex. N).

148. **Termination Protections:** Plaintiff could only be terminated "for cause," with written notice and opportunity to cure. (Ex. N).

149. **Profit Sharing & Inspection Rights:** Agreements required accurate recordkeeping, timely distributions of profits, and access to books and records. (Exs. M, M-1, 100, 113, 115, 117).

## B. Breaches by Defendants

150. **1. Salary & Compensation**

151. Defendants cut Plaintiff's salary by 25% in 2020 despite securing PPP loans designed to preserve payroll. (Exs. 63, 64, 65).

152. On April 9, 2021, Defendants issued a furlough/termination letter citing insolvency (Ex. O), even as they diverted funds through insider checks and transfers. (Exs. 22–41, 45, 47–49).

153. Plaintiff was denied contractually owed severance pay. (Ex. N).

154. **2. Profit Distributions & Equity Rights**

155. No distributions were ever made to Plaintiff despite recurring revenues in 2020–2021 (Exs. 60, 67, 108–111, 22–41).

156. Defendants filed false tax returns (2020–2023) showing fabricated losses (Exs. 105–110) to justify withholding distributions.

157. Defendants diverted equity to RoughRiders Holdings, crediting themselves with $325,759.60 while erasing Plaintiff's capital account. (Ex. 111).

158. **3. Recordkeeping & Inspection**

159. Plaintiff made multiple formal demands for inspection of records (2020–2025). (Exs. 100, 113, 115, 117).

160. Defendants willfully refused, directly breaching the Operating Agreement's inspection provisions and Colo. Rev. Stat. § 7-80-408.

161. On July 14, 2025, RoughRiders counsel admitted that NRFA was being kept open solely "to defend litigation" and refused further access. (Ex. 66).

162. **4. Wrongful Termination**

163. Plaintiff was terminated/furloughed without contractual cause, notice, or cure opportunity. (Ex. O).

164. The termination letter was pretextual: internal records show Defendants had access to PPP funds and concealed profits. (Exs. 61, f, 63–65).

## C. Damages

165.    As a direct result of Defendants' breaches, Plaintiff has sustained damages including:

166.    **Unpaid salary & severance:** $250,000+ (Exs. N, O, 63–65).

167.    **Withheld profit distributions:** $500,000+ (Exs. 60, 67, 108–111).

168.    **Lost equity value:** $1.5M+ (Ex. 111).

169.    **Lost business expectancy (NWSL/USL franchise opportunity):** $12M+ (Exs. NFARIDERS, 131, W, AC, I).

170.    **Consequential and reputational damages:** $750,000+ (Ex. 111).

171.    Total contract damages exceed **$15 million**, exclusive of punitive damages, interest, and costs.

## D. Relief Requested on Count III

172.    Plaintiff seeks:

    a. Compensatory damages for all unpaid salary, severance, and distributions;

    b. Restitution of equity value diverted to RoughRiders Holdings;

    c. Consequential damages, including lost business opportunities;

    d. Pre- and post-judgment interest;

    e. Attorneys' fees and costs where permitted;

    f. Such other relief as the Court deems just and proper.

**Key Exhibits for Count III**: Exs. N, M, M-1, 114, O, 22–41, 45, 47–49, 60, 61, f, 63–65, 66, 100, 113, 115, 117, 105–111, 116.

## COUNT VI — BREACH OF FIDUCIARY DUTY

173.    (Against Sdao, Perry, Reed, Robinson, NRFA, RoughRiders Holdings, Impact Sports)

174.    Plaintiff incorporates ¶¶1–123 as if fully set forth herein.

## A. Fiduciary Duties Owed

175.    As majority owner (Sdao), CFO (Perry), manager/officer (Reed), and President of RoughRiders (Robinson), Defendants owed Plaintiff fiduciary duties of loyalty, care, candor, and good faith under the Operating Agreement, Contribution Agreement, and Colorado law. (Exs. M, M-1, 114, 76).

176.    Duties included:

    a.    Maintaining accurate financial records;

    b.    Using company funds solely for company purposes;

    c.    Distributing profits according to ownership interests;

    d.    Avoiding self-dealing, waste, and concealment of material facts;

e. Providing access to records and financials on demand.

## B. Breach Through Concealment of Financial Condition

177. Defendants misrepresented NRFA's solvency and profits by:
   a. Filing false tax returns (2020–2023) reporting losses while bank statements showed substantial inflows. (Exs. 105–110).
   b. Producing a Feb. 28, 2021 "estimate" showing negative retained earnings of −$159,148.32 while deposits exceeded $188,000. (Ex. f, 108).
   c. Filing Periodic Reports (2021–2025) certifying good standing, concealing insolvency and Plaintiff's 49% ownership. (Exs. 71–75).

## C. Breach Through Diversion of Assets & Fraudulent Transfers

178. Defendants siphoned NRFA funds from Jan 2020–Apr 2022 through insider withdrawals:
   a. $50,000 checks in Jan. 2020 immediately after capital contributions (Ex. 22).
   b. Oct. 2020: Check #1058 for $20,487.05; Check #1057 for $10,750; ACH withdrawals totaling $6,720. (Ex. 31).
   c. Jan. 2021: Check #1095 for $8,000. (Ex. 33).
   d. Mar. 2021: Check #1109 for $6,000. (Ex. 36).
   e. May 2021: Check #1131 for $5,844.37. (Ex. 38).
   f. Jun. 2021: $7,700 "loan" transfer, followed by Check #1134 for $7,400. (Ex. 39).
179. By Aug. 2021, NRFA's balance dropped to **$264.84**; by Dec. 2021–Apr. 2022, to **$25.33**. (Exs. 41, 45, 47–49).
180. These actions benefitted RoughRiders Holdings and Impact Sports while stripping NRFA of operational funds.

## D. Breach Through Misuse of PPP Funds

181. Defendants obtained PPP loans ($280,000+) through related entities (Impact Sports, Sport Stable). (Ex. B, 65).
182. While PPP funds were available, Plaintiff's salary was cut by 25% (Exs. 63–64) and he was furloughed Apr. 9, 2021 (Ex. O).
183. Misapplication of federal relief funds constitutes both fraud and breach of fiduciary duty, as managers were obligated to use PPP proceeds for payroll, including Plaintiff's.

## E. Breach Through Suppression of Member Rights

184. Plaintiff repeatedly requested inspection of records (2020–2025). (Exs. 100, 113 (1–6), 115, 117).

185. On July 14, 2025, RoughRiders' counsel flatly denied further records, admitting NRFA existed only "to defend litigation." (Ex. 66).

186. Defendants intentionally suppressed Plaintiff's statutory inspection rights, preventing him from discovering the scope of fraud until 2024–2025.

### F. Breach Through Retaliation & Racial Hostility

187. Plaintiff, a Black man of Nigerian descent, reported repeated incidents of racial harassment (e.g., slurs, threats, graffiti). (Exs. c, L, b, d, e, AJ, AK, AL).

188. Instead of protecting Plaintiff or investigating, Defendants retaliated by cutting pay, refusing records, and terminating him without cause. (Exs. O, 64, 66).

189. Ignoring fiduciary duties of good faith and candor, Defendants used retaliation as a tool to silence Plaintiff's opposition to misconduct.

### G. Damages

190. As a direct result of Defendants' fiduciary breaches, Plaintiff suffered:

191. **Salary & severance losses:** $250,000+ (Exs. N, O, 63–64).

192. **Profit distributions withheld:** $500,000+ (Exs. 60, 67, 108–111).

193. **Equity value stripped/diverted:** $1.5M+ (Ex. 111).

194. **Lost franchise opportunity:** $12M+ (Exs. NFARIDERS, 131, W, AC, I).

195. **Consequential & reputational damages:** $750,000+.

196. Total fiduciary duty damages exceed $15 million, exclusive of punitive damages and equitable remedies.

### H. Relief Requested on Count IV

197. Plaintiff seeks:
   a. Compensatory damages in excess of $15M;
   b. Punitive damages for willful breaches;
   c. Disgorgement of profits and imposition of a constructive trust;
   d. Appointment of a receiver over NRFA assets;
   e. Order compelling full accounting and production of records;
   f. Pre- and post-judgment interest;
   g. Such other relief as the Court deems just and proper.

**Key Exhibits for Count IV**: Exs. M, M-1, 114, 76, 22–41, 45, 47–49, 60, 61, f, 63–65, 66, 100, 113, 115, 117, 105–111, B, O, AJ, AK, AL, c, d, e, b, L, NFARIDERS, 131, W, AC, I.

### COUNT V — CONVERSION & UNJUST ENRICHMENT

198. (Against All Defendants)

199. Plaintiff incorporates ¶¶1–120 as if fully set forth herein.

## A. Legal Right to Funds and Property

200. Plaintiff had a lawful right to:
   a. Salary and severance under his Employment Agreement. (Ex. N).
   b. Profit distributions tied to his 49% equity interest. (Exs. M, M-1, 114).
   c. Access to PPP-supported payroll funds allocated to NRFA. (Exs. 63–65, B).
   d. Books, records, and financials necessary to protect his ownership interest. (Exs. 113, 115, 117, 66).

201. Defendants were obligated to safeguard these funds and records for Plaintiff's benefit.

## B. Defendants' Conversion of Specific Sums

202. Defendants intentionally and unlawfully exercised dominion over Plaintiff's property by:

**203.    a. Salary and Severance**

204. Cutting Plaintiff's salary by 25% in 2020–2021 despite PPP funds available to maintain payroll. (Exs. 63–65).

205. Issuing an April 9, 2021 furlough letter claiming insolvency while diverting funds. (Ex. O).

206. Refusing to pay severance guaranteed under the Employment Agreement. (Ex. N).

**207.    b. Profit Distributions**

208. From 2020–2023, Defendants reported false losses on tax returns (Exs. 105–110) while bank records show steady player revenue deposits (Exs. 26, 29, 31, 33, 34, 49).

209. No distributions were ever made to Plaintiff despite contractual entitlement. (Exs. M, M-1).

**210.    c. Insider Withdrawals**

211. Oct. 2020: Check #1058 for $20,487.05; Check #1057 for $10,750; ACH withdrawals of $6,720. (Ex. 31).

212. Jan. 2021: Check #1095 for $8,000. (Ex. 33).

213. Mar. 2021: Check #1109 for $6,000. (Ex. 36).

214. May 2021: Check #1131 for $5,844.37. (Ex. 38).

215. Jun. 2021: $7,400 withdrawal following a $7,700 "loan" entry. (Ex. 39).

**216.    d. Account Dissipation**

217. By Aug. 2021, NRFA's balance was $264.84; by Dec. 2021–Apr. 2022, it was $25.33. (Exs. 41, 45, 47–49).

## C. Unjust Enrichment

218. Defendants retained the benefit of Plaintiff's labor, goodwill, intellectual property, and investor relationships while refusing to compensate him.

219. Defendants also used Plaintiff's reputation and connections to approach NWSL/USL investors (Exs. NFARIDERS, 131, W, AC, I), then ousted him to capture the multimillion-dollar franchise opportunity.

220. Retaining these benefits without payment unjustly enriched Defendants at Plaintiff's expense.

## D. Damages

221. Plaintiff has been permanently deprived of:
   a. **Salary & severance**: $250,000+ (Exs. N, O, 63–64).
   b. **Profit distributions**: $500,000+ (based on P&L revenues). (Exs. 60, 67, 109, 120).
   c. **Equity value**: $1.5M+ siphoned to RoughRiders Holdings. (Ex. 111).
   d. **Franchise opportunity**: $12M+ lost expectancy. (Exs. NFARIDERS, 131, W, AC, I).
   e. **Reputational/emotional damages**: $750,000+.

222. Total damages from conversion/unjust enrichment exceed **$15M**, exclusive of punitive damages.

## E. Relief Requested on Count V

223. Plaintiff seeks:
   a. Compensatory damages in excess of $15M;
   b. Punitive damages for intentional and willful conversion;
   c. Disgorgement of unlawfully obtained funds;
   d. Imposition of a constructive trust on all diverted assets;
   e. Equitable accounting;
   f. Pre- and post-judgment interest;
   g. Such other relief as the Court deems just and proper.

**Key Exhibits for Count V**: Exs. N, M, M-1, 114, 26, 29, 31, 33, 34, 39, 41, 45, 47–49, 60, 67, 109, 120, 105–110, 111, 63–65, B, O, NFARIDERS, 131, W, AC, I.

## COUNT VI — VIOLATION OF STATUTORY INSPECTION RIGHTS

224. (C.R.S. § 7-80-408; Against All Defendants)

225. Plaintiff incorporates ¶¶1–130 as if fully set forth herein.

## A. Legal Rights Under Colorado LLC Act

226. As a 49% equity member of Nisola-RoughRiders Futbol Academy, LLC ("NRFA"), Plaintiff has a statutory right under C.R.S. § 7-80-408 to inspect and copy, upon reasonable notice, all books, records, tax returns, financial statements, and other information relating to the company's business.

227. The Operating Agreement and Contribution Agreement (Exs. M, M-1, 114) reaffirm Plaintiff's rights to access records, inspect financials, and protect his ownership interest.

## B. Plaintiff's Repeated Demands

228. Beginning in 2020, Plaintiff made repeated written requests for financial records, including payroll ledgers, PPP loan applications, bank statements, and tax returns. See Exs. 100; 113 (1–6); 115; 116 (Affidavit).

229. On July 14, 2025, Plaintiff issued a formal Legal Notice and Demand for Inspection of Records under C.R.S. § 7-80-408. See Ex. 117; Ex. 66 (Defendants' refusal).

230. Plaintiff requested:
   a. Complete bank statements for 2020–2023;
   b. Tax returns for 2020–2023;
   c. Payroll records and PPP documentation;
   d. Member capital account records;
   e. Balance sheets and Profit & Loss statements.

## C. Defendants' Refusal and Concealment

231. Defendants **refused** to provide records in full, producing only incomplete spreadsheets and selected summaries while concealing:
   a. The 2020–2023 tax returns until compelled in 2024 (Exs. 105–110);
   b. The 2023 Balance Sheet showing equity diversion to RoughRiders Holdings (Ex. 111);
   c. Bank records showing large insider withdrawals and depletion of funds to $25 (Exs. 26, 29, 31, 33, 34, 49).

232. In their July 14, 2025 response (Ex. 66), Defendants falsely claimed they had provided "all relevant records," admitted NRFA was kept open solely to defend this lawsuit, and continued to deny access.

## D. Tolling and Discovery Rule

233. Because Defendants withheld records until 2024–2025, Plaintiff could not reasonably discover the full scope of fraud and diversion earlier.

234. Under the discovery rule, statutes of limitation are tolled until Plaintiff actually obtained the concealed tax returns, balance sheets, and bank records in 2024–2025.

**E. Damages**

235. As a direct result of Defendants' violation of C.R.S. § 7-80-408, Plaintiff suffered:

236. Inability to monitor his ownership interest;

237. Loss of salary, severance, and profit distributions concealed by the missing records;

238. Loss of equity value ($1.5M+) shifted to RoughRiders Holdings (Ex. 111);

239. Lost opportunity to prevent fraudulent transfers;

240. Emotional distress and reputational harm.

241. Plaintiff is entitled to:

242. Statutory penalties under C.R.S. § 7-80-408(2);

243. Compensatory damages exceeding $5M tied to concealed funds and distributions;

244. Attorney's fees and costs (statutory entitlement);

245. Equitable remedies including appointment of a receiver to secure NRFA assets.

**F. Relief Requested**

246. Plaintiff requests:
    a. Judgment against Defendants for violation of C.R.S. § 7-80-408;
    b. Statutory penalties and attorney's fees;
    c. Compensatory damages exceeding $5M;
    d. Equitable accounting and appointment of a receiver;
    e. Disgorgement of profits concealed by Defendants' record-keeping violations;
    f. Such other relief as the Court deems just.

**Key Exhibits for Count VI**: Exs. M, M-1, 114 (agreements); 100; 113 (1–6); 115; 116; 117; 66 (inspection demands); 105–110 (tax returns); 111 (2023 Balance Sheet); 26, 29, 31, 33, 34, 49 (bank records).

**COUNT VII — RACE DISCRIMINATION AND RETALIATION UNDER 42 U.S.C. § 1981**
*(Against All Defendants)*

247. Incorporation. Plaintiff realleges ¶¶ 1–246] as if fully set forth herein.

248. Statute and protected rights. 42 U.S.C. § 1981 guarantees all persons the same right to make, perform, modify, and enforce contracts, and to the full and equal benefit of all laws as is enjoyed by white citizens.

249. Contracts at issue. Plaintiff entered valid contracts with Defendants, including (a) the Employment Agreement (Ex. N) and (b) the Operating/Contribution Agreements granting him a 49% equity interest in NRFA (Exs. M, M-1, 114, 116).

250. Discrimination & hostile environment. Defendants, acting individually and collectively, subjected Plaintiff (a Black man of Nigerian descent) to race-based hostility and adverse actions, including: the Oct. 26, 2020 assault with racial slurs (Ex. AJ), the

Mar. 1, 2021 threat by Sdao (Ex. AK), racially derogatory graffiti and intimidation (Ex. c), and slurs by management (Ex. e), which Defendants tolerated and failed to remedy (Ex. AL).

251. Interference with contract & retaliation. Because of Plaintiff's race and protected complaints, Defendants intentionally interfered with his contractual rights by: (a) cutting salary despite PPP funds (Exs. 63–65); (b) refusing severance owed (Ex. O); (c) withholding distributions and records needed to enforce ownership rights (Exs. 60, 67, 105–111, 117, 66); and (d) terminating/furloughing him on Apr. 9, 2021 (Ex. O) and blacklisting him, thereby blocking his performance and benefits under the contracts.

252. Causation (Comcast standard). Race was a but-for cause of the hostile environment and adverse, contract-related actions described above, and of Defendants' retaliatory conduct after Plaintiff opposed race-based harassment.

253. Damages. As a direct and proximate result, Plaintiff suffered: (a) lost wages/benefits > $250,000; (b) lost profit distributions and equity value > $1.5 million; (c) destruction of a professional franchise opportunity valued in the eight figures (Ex. A and supporting exhibits); and (d) emotional distress, reputational harm, and other consequential losses.

254. Remedies. Plaintiff seeks:
(a) compensatory damages (economic and non-economic);
(b) punitive damages for Defendants' willful and malicious conduct;
(c) equitable relief, including constructive trust, accounting, and rescission/claw-back of fraudulently transferred assets;
(d) attorneys' fees and costs under 42 U.S.C. § 1988; and
(e) pre- and post-judgment interest and such further relief as is just.

**Key Exhibits (non-exhaustive): Exs. N, M, M-1, 114, 116, 63–65, 60, 67, 105–111, 117, 66, AJ, AK, AL, c, e, A, W, AC, I, 131, 128–129.**

## COUNT VIII — COLORADO ANTI-DISCRIMINATION ACT (C.R.S. § 24-34-402)

(Against All Defendants)

255. Plaintiff incorporates ¶¶1–175 as if fully set forth herein.

### A. Protected Class & Employment

256. Plaintiff is a Black man of Nigerian descent, protected against discrimination in employment under the Colorado Anti-Discrimination Act (CADA), C.R.S. § 24-34-402.

257. Plaintiff was employed by Defendants as Director of Soccer pursuant to a three-year Employment Agreement, earning a $100,000 annual salary, profit share, and managerial authority. (Ex. N).

**B. Discrimination and Hostile Work Environment**

258. From 2020–2021, Plaintiff was subjected to repeated racial harassment and threats at the Sport Stable and within RoughRiders/Impact management:
   a. **Assault and Slurs**: On October 26, 2020, Defendant Chad Jacobsen physically grabbed Plaintiff and screamed racial slurs including "boy." (Ex. AJ).
   b. **Threat of Violence**: On March 1, 2021, Defendant Tony Sdao attempted to assault Plaintiff at a youth practice, demanding he attend a meeting "or else." (Ex. AK).
   c. **Graffiti & Intimidation**: Parents reported "GORILLA" spray-painted on storage facilities and a man with a holstered gun at practice. (Ex. c).
   d. **Management's Racism**: Manager Rylan Reed called a Hispanic coach a "Mexican donkey," evidencing Defendants' tolerance of ethnic slurs. (Ex. e).
   e. **Witness Statement**: RoughRiders secretary Courtney Wilcox documented fear for Plaintiff's safety and considered contacting the NAACP. (Ex. AL).
259. Defendants failed to take corrective or preventive action, thereby permitting and condoning a racially hostile environment in violation of CADA.

**C. Retaliation**

260. Plaintiff repeatedly complained about racial harassment, hostile conditions, and financial misconduct to Defendants.
261. Instead of addressing his concerns, Defendants retaliated by:
   a. Cutting his salary 25% despite PPP funds available. (Exs. 63–65).
   b. Furloughing him on April 9, 2021. (Ex. O).
   c. Blacklisting him from the local soccer community and professional advancement.
262. Reed attempted to silence Plaintiff with a $100,000 hush-money offer and warned that legal action would be a "nuclear bomb" for RoughRiders. (Ex. U).

**D. Statutory Violations**

263. Under C.R.S. § 24-34-402(1)(a), it is unlawful for an employer to "discriminate against any person otherwise qualified because of race, color, or national origin."
264. Under C.R.S. § 24-34-402(1)(e)(I), it is unlawful to retaliate against an employee for opposing discriminatory practices or filing a complaint.
265. Defendants' actions — including harassment, termination, and refusal to provide equal terms of employment — violated both provisions.

**E. Damages**

266. As a direct result of Defendants' CADA violations, Plaintiff suffered:
267. Lost wages, salary, severance, and benefits ($250,000+).

268.    Lost profit distributions and equity value ($1.5M+).

269.    Loss of an NWSL/USL franchise opportunity exceeding $12M.

270.    Emotional distress, humiliation, and reputational damage exceeding $750,000.

271.    CADA permits compensatory damages, punitive damages, equitable relief, and attorney's fees/costs.

## F. Relief Requested

272.    Plaintiff respectfully requests judgment in his favor under CADA, awarding:
   a. Compensatory damages in excess of $15 million;
   b. Punitive damages to punish and deter Defendants' willful misconduct;
   c. Injunctive relief preventing further discrimination and retaliation;
   d. Attorney's fees, expert fees, and costs under C.R.S. § 24-34-405;
   e. Pre- and post-judgment interest at the statutory rate;
   f. Such other relief as the Court deems just and proper.

**Key Exhibits for Count VIII**: Exs. N, O, AJ, AK, AL, c, e, U, 63–65, 116–117.

## COUNT IX — INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE

(Against All Defendants)

273.    Plaintiff incorporates ¶¶1–245 as if fully set forth herein.

### A. Existence of a Valid Business Expectancy

274.    By 2020–2021, Plaintiff cultivated concrete opportunities to secure an NWSL (National Women's Soccer League) expansion franchise and related United Soccer League (USL) pathways.

275.    Plaintiff engaged with investors, advisors, and league officials, including former NWSL Commissioner Jeff Plush, and exchanged planning materials with executives such as Adams Miller and Yael Averbuch. (Exs. 131, W, AC, I, NFARIDERS 2020–23 Beyond, 128–129).

276.    These efforts positioned Plaintiff to lead NRFA's professional expansion, building upon his role as Director of Soccer and 49% equity owner.

### B. Defendants' Knowledge of Expectancy

277. Defendants Tony Sdao, Michael Perry, Rylan Reed, and Derek Robinson were fully aware of Plaintiff's franchise negotiations and relied on his contacts to present NRFA as a viable partner in league discussions.

278. Defendants understood that Plaintiff's reputation, playing career, and network were central to advancing the NWSL/USL bid.

## C. Defendants' Intentional and Improper Conduct

279. Rather than support the opportunity, Defendants engaged in deliberate misconduct to **exclude Plaintiff** and capture the benefits for themselves:

a. **Termination**: On April 9, 2021, Defendants furloughed and terminated Plaintiff without cause, stripping him of his leadership role. (Ex. O).

b. **Smear Campaign**: Defendants spread reputational harm and blacklisted Plaintiff in the soccer community.

c. **Diversion of Assets**: Defendants drained NRFA accounts, concealed revenues, and filed false financials to fabricate insolvency. (Exs. 60, 67, 105–111, 108, 109, 111, 29, 31, 33, 34, 49).

d. **Suppression of Records**: By denying Plaintiff inspection rights (Exs. 117, 66, 113), Defendants prevented him from proving solvency and continuing franchise negotiations.

e. **Retaliation**: When Plaintiff raised concerns about racial harassment, Defendants responded with hostility and termination, further sabotaging his prospects. (Exs. AJ, AK, AL, c, U).

## D. Causation and Damages

280. But for Defendants' interference, Plaintiff had a reasonable probability of securing a franchise license and leading NRFA into professional competition.

281. The NWSL/USL franchise opportunity represented a financial expectancy exceeding $100 million in enterprise value, with anticipated equity, salary, sponsorship, and revenue streams for Plaintiff personally exceeding $15 million. (Ex. A – Business Loss Valuation Memo).

282. Defendants' actions directly caused the destruction of this expectancy.

## E. Legal Standard

283. Under Colorado law, intentional interference with prospective business advantage requires:

a. Existence of a valid business expectancy;

b. Defendant's knowledge of that expectancy;

c. Intentional and improper interference;

d. Resulting damages.

284. All elements are met here. See *Amoco Oil Co. v. Ervin*, 908 P.2d 493 (Colo. 1995) (recognizing interference with prospective contractual relations).

## F. Relief Requested

285. Plaintiff respectfully requests judgment in his favor on Count IX, awarding:
a. Compensatory damages for loss of equity, profits, salary, and business expectancy exceeding **$15 million**;
b. Consequential damages for reputational harm and emotional distress;
c. Punitive and exemplary damages given Defendants' malice and reckless disregard;
d. Equitable relief including constructive trust and disgorgement of any benefits Defendants gained from Plaintiff's work;
e. Attorneys' fees, expert fees, and costs;
f. Pre- and post-judgment interest;
g. Such other and further relief as the Court deems just.

**Key Exhibits for Count IX**: Exs. 131, W, AC, I, NFARIDERS 2020–23 Beyond, 128–129, A (Valuation Memo), O, 117, 66, 29, 31, 33, 34, 49, AJ, AK, AL, c, U.

## COUNT X — 42 U.S.C. § 1981 (Race Discrimination & Interference with Contracts)

(Against All Defendants)

286. Plaintiff incorporates ¶¶1–245 as if fully set forth herein.

## A. Protected Rights Under § 1981

287. Section 1981 guarantees all persons within the jurisdiction of the United States the same right to make, enforce, and benefit from contracts as is enjoyed by white citizens.
288. Plaintiff, a Black man of Nigerian descent, entered into valid and enforceable contracts with Defendants, including:
   a. The Employment Agreement dated December 6, 2019, guaranteeing salary, severance, and managerial authority (Ex. N);
   b. The Operating Agreement and Contribution Agreement, granting Plaintiff 49% equity ownership of NRFA (Exs. M, M-1, 116).
289. These contracts created enforceable rights to salary, profit distributions, equity value, and managerial participation.

## B. Discrimination and Harassment

290.    Defendants, acting individually and collectively, discriminated against Plaintiff in violation of § 1981 by:

a. Subjecting him to racial harassment and physical threats, including Chad Jacobsen's October 26, 2020 assault while shouting racial slurs, and Tony Sdao's March 1, 2021 attempted assault. (Exs. AJ, AK, AL).

b. Permitting and condoning racially derogatory graffiti, slurs, and intimidation tactics, including "GORILLA" graffiti and gun brandishing at youth practice. (Ex. c).

c. Using racially demeaning terms for other coaches, including Rylan Reed calling a Hispanic coach a "Mexican donkey." (Ex. e).

d. Ignoring and minimizing Plaintiff's complaints, instead urging him to "keep quiet" and offering a $100,000 hush-money bribe. (Ex. U).

## C. Interference with Contractual Rights

291.    Defendants intentionally interfered with Plaintiff's ability to make and enforce contracts by:

    a.  Cutting Plaintiff's salary by 25% despite PPP loan funds. (Exs. 63–65).

    b.  Refusing to pay severance guaranteed by the Employment Agreement. (Ex. O).

    c.  Withholding profit distributions owed under the Operating Agreement. (Exs. 60, 67, 105–111).

    d.  Denying Plaintiff inspection rights critical to enforcing his ownership interest. (Exs. 117, 66).

    e.  Forcing his termination to prevent him from benefitting from the NWSL/USL franchise opportunity. (Exs. A, W, AC, I, 131, 128–129).

292.    These actions were motivated by racial bias, hostile work environment, and retaliation for Plaintiff's protected complaints.

## D. Causation and Harm

293.    As a direct result of Defendants' § 1981 violations, Plaintiff suffered:

    a.  Lost wages, salary, severance, and benefits exceeding $250,000;

    b.  Lost profit distributions and equity value exceeding $1.5 million;

    c.  Destruction of his NWSL/USL franchise opportunity valued at $12–15 million (Ex. A – Valuation Memo);

    d.  Emotional distress, humiliation, and reputational damage exceeding $750,000.

294.    Defendants' conduct was intentional, malicious, and reckless, warranting punitive damages under § 1981.

## E. Legal Standard

295.   Section 1981 prohibits both direct discrimination and retaliation that interferes with an individual's right to make and enforce contracts.

296.   Defendants' conduct constitutes:

297.   Race discrimination (hostile environment and adverse actions based on race);

298.   Retaliation (termination and blacklisting after Plaintiff complained);

299.   Interference with contracts (salary, equity, profit-share, inspection rights, franchise expectancy).

## F. Relief Requested

300.   Plaintiff respectfully requests judgment under § 1981, awarding:
a. Compensatory damages in excess of $15 million, including economic and non-economic losses;
b. Punitive and exemplary damages to punish and deter Defendants' willful misconduct;
c. Equitable relief, including constructive trust, accounting, and rescission of fraudulent transfers;
d. Attorneys' fees and costs under 42 U.S.C. § 1988;
e. Pre- and post-judgment interest at the statutory rate;
f. Such other and further relief as the Court deems just and proper.

**Key Exhibits for Count X**: Exs. N, M, M-1, 116, 63–65, 60, 67, 105–111, 117, 66, AJ, AK, AL, c, e, U, A, W, AC, I, 131, 128–129.

## COUNT XI — DECLARATORY RELIEF

(Regarding Non-Compete and Non-Disclosure Provisions)

301.   Plaintiff incorporates ¶¶1–245 as if fully set forth herein.

## A. Background

302.   Plaintiff's Employment Agreement (Ex. N) and related internal documents included restrictive provisions such as non-compete, non-solicitation, and non-disclosure clauses.

303.   After Plaintiff was terminated, Defendants and their counsel invoked these provisions to:
a.   Threaten litigation if Plaintiff pursued soccer ventures outside NRFA;
b.   Interfere with his ability to coach, train, or develop new programs;
c.   Chill his communications with players, parents, and business partners.

## B. Legal Standard

304. Under Colorado law, non-compete clauses in employment contracts are presumptively void unless they fall within narrow statutory exceptions. See C.R.S. § 8-2-113.

305. Courts may declare such provisions unenforceable and void as against public policy, particularly where they are overbroad, indefinite, or imposed for retaliatory purposes.

306. Declaratory relief is appropriate under 28 U.S.C. §§ 2201–2202 where a justiciable controversy exists regarding contractual rights and obligations.

## C. Defendants' Misuse of Restrictions

307. Defendants used the alleged non-compete provisions to:
    a. Intimidate Plaintiff after termination;
    b. Prevent him from continuing his coaching career;
    c. Block him from pursuing NWSL/USL franchise opportunities and other soccer business endeavors.

308. These restrictions were retaliatory, imposed in bad faith, and designed to suppress Plaintiff's contractual and civil rights.

## D. Actual Controversy

309. An actual, substantial controversy exists between Plaintiff and Defendants regarding the enforceability of these provisions.

310. Plaintiff continues to develop soccer ventures (NFA, NFA-FK 5280) and requires clarity to avoid further threats, interference, or litigation by Defendants.

## E. Relief Requested

311. Plaintiff respectfully requests that the Court issue a declaratory judgment:
a. Declaring the non-compete, non-solicitation, and non-disclosure clauses in Plaintiff's Employment Agreement (Ex. N) unenforceable and void under Colorado law;
b. Enjoining Defendants from asserting or enforcing said clauses against Plaintiff;
c. Awarding Plaintiff his attorneys' fees and costs under 28 U.S.C. § 2202;
d. Granting such other relief as the Court deems just and proper.

**Key Exhibits for Count XI**: Ex. N (Employment Agreement), Exs. 63–65 (payroll/PPP records), Ex. O (termination/furlough), Ex. A (Valuation Memo).

## VI. PRAYER FOR RELIEF

312.    WHEREFORE, Plaintiff Oluwanisola "Sola" Abolaji respectfully requests that the Court enter judgment in his favor and against all Defendants, jointly and severally, and award the following relief:

a. Compensatory damages for all injuries sustained, including economic losses, breach-of-contract damages, and tort-based damages under federal and state law;

b. Back pay and front pay, together with damages for emotional distress, reputational harm, and punitive or exemplary damages sufficient to deter future misconduct;

c. Disgorgement of unlawfully retained profits, imposition of a constructive trust, claw-back of fraudulent transfers, and a full accounting of all financial transactions related to Nisola-RoughRiders Futbol Academy, LLC, and related entities;

d. Statutory penalties, attorneys' fees, and costs pursuant to C.R.S. § 7-80-408, 42 U.S.C. § 1988, and all other applicable fee-shifting provisions;

e. Injunctive relief compelling Defendants to produce all corporate books and records and, if necessary, appointing a receiver or special master to oversee compliance and protect Plaintiff's ownership interests;

f. Declaratory relief confirming Plaintiff's ownership interest and Defendants' fiduciary duties and declaring their actions unlawful and voidable;

g. Pre- and post-judgment interest, taxable costs, and any other sums authorized by law; and

h. Such further and additional relief as the Court deems just, equitable, and proper under the circumstances.

## VII. JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

Date: **October 22, 2025**

Oluwanisola "Sola" Abolaji



524 Hawthorn Circle
Frederick, CO 80530
Phone: (720) 245-0971
Email: sola@nfa-fk.com
Plaintiff, Pro Se

## IX. EXHIBIT INDEX (Consolidated)

| Exhibit | Description | What It Demonstrates / Proves |
|---|---|---|
| **M** | NRFA Operating Agreement (2019) | Establishes ownership structure (49% Plaintiff / 51% RoughRiders) and member rights. |
| **M-1** | Contribution Agreement (2019) | Confirms capital contributions and transfer of Nisola Futbol Academy intellectual property. |
| **76** | Articles of Organization / Entity Filings | Shows formal creation of NRFA and controlling relationship with RoughRiders Holding LLC. |
| **114** | Governance / Ownership Confirmations | Proves managerial control by Tony Sdao and executive officers. |
| **N** | Employment Agreement (effective 1/1/2020) | Sets Plaintiff's $100,000 salary, 3-year term, severance, and profit-share rights. |
| **O** | April 9 2021 Furlough / Termination Letter | Demonstrates pretextual termination citing false insolvency. |

| 22-41 | Bank Statements (Jan 2020 – Jul 2021) | Show insider withdrawals, "loan" transfers, and misuse of NRFA funds. |
|---|---|---|
| 29 | Bank Statement (Aug 2020) – $22,786.66 check | Example of high-value insider transaction contradicting insolvency claims. |
| 31 | Bank Statement (Oct 2020) – checks #1057 & #1058 | Reflects transfers to insiders during period of claimed financial distress. |
| 32 | Bank Statement (Nov 2020) – checks $10,234.00 & $10,234.15 | Further proof of cash diversion to affiliates. |
| 33 | Bank Statement (Jan 2021) – check #1095 | Illustrates ongoing withdrawals even as Defendants alleged cash shortage. |
| 36 | Bank Statement (Mar 2021) – check #1109 | Shows financial activity immediately before March 11 2021 "capital call." |
| 38-39 | Bank Statements (May–Jun 2021) – checks #1131 & #1134 | Reflect continued dissipation of NRFA funds after Plaintiff's termination. |
| 41 | Bank Statement (Jul 2021) – balance $264.84 | Demonstrates depletion of funds due to insider transfers. |
| 45, 47-49 | Bank Statements (Dec 2021–Apr 2022) – $25 balance | Confirms NRFA accounts left nearly empty post-diversion. |
| 60 | 2020 Profit & Loss Statement | Used to contrast actual bank inflows and highlight fabricated losses. |
| 61 | Internal 4/10/21 P&L | Contradicts Defendants' insolvency claim used to justify termination. |

| | | |
|---|---|---|
| **67** | 2021 Profit & Loss Statement | Continues pattern of misrepresented losses. |
| **E** | *NEW* – NRFA "Estimated" Financials (Feb 28 2021) | Shows $188,678 income and negative retained earnings (–$159,148.32); disproves insolvency and supports fraud allegations. |
| **105-110** | 2020-2023 Tax Returns | Reveal falsified loss reporting and concealment of revenues. |
| **105a, 107a, 108, 111** | 2020-2023 Balance Sheets | Show contradictory equity positions and insider crediting of RoughRiders. |
| **109** | 2022 Profit & Loss Statement | Continues loss fabrication; no legitimate expenses documented. |
| **120** | 2023 Profit & Loss Statement | Confirms ongoing concealment after Plaintiff's removal. |
| **100** | Early Written Requests for Books/Records (2020-2021) | Evidence of Plaintiff's statutory inspection demands. |
| **113 (1-6)** | June 2022 Inspection / Access Requests (emails) | Proof Defendants ignored repeated formal record requests. |
| **115** | Legal Notice – Member Inspection Rights (image version) | Documents formal notice invoking C.R.S. § 7-80-408 rights. |
| **117** | Legal Notice – Demand for Inspection (7/14/2025) | Final demand before suit; shows continued refusal. |

| 66 | 7/14/2025 Counsel Letter (refusal to produce records) | Admits NRFA "kept open only to defend your lawsuit." |
|---|---|---|
| 116 | Affidavit of Oluwanisola Abolaji | Summarizes timeline, denials, and supporting facts. |
| A | Business Loss Valuation Memo | Quantifies $45 million lost opportunity from NWSL/USL franchise exclusion. |
| 121-123 | Sport Stable / Blue Sport Stable invoices and transfer docs | Show inter-company billing and fraudulent diversion of NRFA funds. |
| 210 (1-2) | *NEW* – March 1 2021 Video Recording (Tony Sdao confrontation) | Corroborates physical intimidation and retaliation at the Sport Stable witnessed by staff. |
| 211 | *NEW* – Nov 16 2020 Text (Tony Sdao to Rylan Reed et al.) | Proves Sdao directed Rylan Reed to "assist and support" Plaintiff, confirming Reed's managerial role. |
| 212 | *NEW* – Mar 5 2021 Text (Danielle Reed to Plaintiff) | Confirms Rylan Reed's continued involvement and Reed family's awareness of misconduct at Impact. |
| 216 | *NEW* – Impact Sports Performance Web Profile | Lists Rylan Reed as Owner/General Manager and Danielle Reed as Owner of Impact Kids Club; proves control of affiliate used for diversion. |
| C | Parents' Letter (March 12 2021) | Documents community complaint about racial hostility and safety concerns following Sdao's conduct. |

| | | |
|---|---|---|
| **200** | Statement of Courtney Wilcox | Confirms Sdao's public confrontation and verbal aggression. |
| **201** | Statement of Greg Preciado | Confirms Sdao physically cornered Plaintiff during practice. |
| **Other** | Emails, texts, and screenshots documenting harassment, racial discrimination, and Plaintiff's efforts to obtain relief. | Corroborates pattern of retaliation, concealment, and discrimination throughout timeline. |

**Respectfully submitted,**

Date: **October 24, 2025**

Oluwanisola "Sola" Abolaji



524 Hawthorn Circle
Frederick, CO 80530
Phone: (720) 245-0971
Email: sola@nfa-fk.com
Plaintiff, Pro Se

**CERTIFICATE OF SERVICE**

I certify that on **October 22, 2025**, I filed the foregoing **Complaint and Jury Demand** with the Clerk of Court for the United States District Court for the District of Colorado. After the Clerk issues summonses, I will serve each Defendant in accordance with **Fed. R. Civ. P. 4** by personal service or waiver of service. I will promptly file proofs of service (or waivers) with the Court.